# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

SHANICE J. PARKER,

        Plaintiff,

  v.

                                   Case No. 2:16-cv-1143
                                   JUDGE GEORGE C. SMITH
                                   Magistrate Judge Elizabeth P. Deavers

ERIC M. MILLER, *et al.*,

        Defendants.

## OPINION AND ORDER

This matter is before the Court upon the Partial Motions to Dismiss of Defendants Showplace Wood Products, Inc. ("Showplace") (Doc. 72) and Fowlds Brothers Trucking, Inc. ("Fowlds Brothers"), Dakotaland Transportation, Inc. ("Dakotaland'), Bruce Fowlds ("Bruce"), and Jerald Fowlds ("Jerald") (Doc. 73). The motion is fully briefed and ripe for disposition. For the following reasons, both motions are **GRANTED IN PART and DENIED IN PART**.

## I.      BACKGROUND

Plaintiff Shanice Parker was involved in a single-car accident on April 12, 2016, while traveling eastbound on I-70 in Licking County, Ohio due to a malfunctioning tie rod in her vehicle. (Doc. 45, 2d Am. Compl. ¶ 106). Parker's vehicle was disabled in the right-most lane of eastbound travel on I-70. (*Id.* ¶ 107). Shortly after, Ohio State Highway Patrol Trooper Rodney Hart arrived in his patrol car and eventually parked it in the right-most lane directly behind Parker's disabled vehicle. (*Id.* ¶ 116). Hart activated the emergency lights on his patrol car and placed road flares to indicate that oncoming traffic should move over into the middle or left-most lanes. (*Id.* ¶ 110).

Hart also asked Parker to be seated in the front passenger seat of the patrol car so he could interview her regarding her single-car accident. (*Id.* ¶ 114). Within minutes, Parker was seriously injured when a tractor trailer driven by Defendant Eric Miller crashed into the parked patrol car in which Parker was seated. (*Id.* ¶¶ 118–31).

At the time of the accident, Miller was a truck driver whom Parker alleges was employed by "Defendant Dakotaland and/or Defendant Fowlds Brothers and/or Defendant Showplace" and was driving the truck as part of his job duties. (*Id.* ¶ 138). The truck involved in the accident was leased by Dakotaland from Fowlds Brothers. (*Id.* ¶¶ 11–12). At the time of the accident, the truck contained wood products manufactured by and being transported on behalf of Showplace. (*Id.* ¶¶ 23, 138).

Parker alleges that the three businesses (Dakotaland, Fowlds Brothers, and Showplace) are closely-related. Specifically, she alleges that Dakotaland and Fowlds Brothers operate as a single enterprise, with 75% of their business comprising the shipment of goods for Showplace. (*Id.* ¶ 31). Since 2000, Showplace has exclusively used Dakotaland and/or Fowlds Brothers as the motor carrier hauling its outbound loads. (*Id.* ¶ 29). Bruce and Jerald Fowlds are the eponymous Fowlds Brothers, and each owns 50% of both Dakotaland and Fowlds Brothers. (*Id.* ¶ 8). Miller, Dakotaland, Fowlds Brothers, Showplace, Bruce, and Jerald are all citizens of South Dakota, whereas Parker is a citizen of Ohio and/or Washington, D.C. (*Id.* ¶¶ 1, 3–7, 13).

In her Second Amended Complaint, Parker asserts claims for (1) negligent operation of a motor vehicle (against Miller); (2) statutory traffic violations establishing negligence *per se* (against Miller); (3) strict liability for Miller's negligence (against Dakotaland);[1] (4) negligent hiring, training, supervising, and retaining of Miller (against Dakotaland and Fowlds Brothers);

---

[1] Originally, this count was also asserted against Showplace. However, Parker subsequently stipulated to the dismissal of this count as against Showplace only. (Doc. 83).

(5) statutory violations establishing negligence *per se* in the hiring, training, supervising, and retaining of Miller (against Dakotaland, Fowlds Brothers, and Showplace); (6) negligent entrustment of the tractor trailer to Miller (against Dakotaland and Fowlds Brothers); (7) corporate veil piercing based on alter ego status (against Dakotaland, Bruce, and Jerald); (8) corporate veil piercing based on alter ego status (against Fowlds Brothers, Bruce, and Jerald); (9) corporate veil piercing based on a "single enterprise theory" (against Dakotaland and Fowlds Brothers); (10) vicarious liability for Miller's negligence (against Dakotaland and Fowlds Brothers); (11) vicarious liability for Dakotaland's and Fowlds Brothers' negligence (against Showplace); (12) negligent retention of Dakotaland and Fowlds Brothers (against Showplace); and (13) non-delegable duty (against Showplace). (*Id.* ¶¶ 144–208).

Showplace, Fowlds Brothers, Dakotaland, Bruce, and Jerald now move for partial dismissal of Parker's Second Amended Complaint. Bruce and Jerald seek dismissal of all claims against them because there are no grounds for piercing the corporate veils of either Dakotaland or Fowlds Brothers, and therefore this Court lacks personal jurisdiction over them as South Dakota citizens. Fowlds Brothers seeks dismissal of all claims against it on grounds that it is a separate entity from Dakotaland, and therefore it was not Miller's employer and not responsible for his actions or for hiring or supervising him. Showplace seeks dismissal of Counts 5 and 13, as well as Parker's request for punitive damages against it. Finally, Dakotaland seeks dismissal of Parker's request for punitive damages against it.

## II.     STANDARDS OF REVIEW

### A.     Dismissal under Rule 12(b)(2)

Bruce and Jerald bring their motion pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, alleging that this Court lacks personal jurisdiction over them. When confronted with a Rule 12(b)(2) motion, "[t]he plaintiff bears the burden of establishing the existence of

jurisdiction." *Estate of Thompson v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 360 (6th Cir. 2008) (citing *Brunner v. Hampson*, 441 F.3d 457, 462 (6th Cir. 2006)). When the Court resolves a Rule 12(b)(2) motion based on "written submission and affidavits . . . rather than resolving the motion after an evidentiary hearing or limited discovery, the burden on the plaintiff is 'relatively slight,' . . . and 'the plaintiff must make only a *prima facie* showing that personal jurisdiction exists in order to defeat dismissal.'" *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007) (quoting *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1169 (6th Cir. 1988); *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991)). Under such circumstances "the pleadings and affidavits submitted must be viewed in a light most favorable to the plaintiff, and the district court should not weigh 'the controverting assertions of the party seeking dismissal.'" *Id.* (quoting *Theunissen*, 935 F.2d at 1459).

Although Plaintiff's *prima facie* burden is relatively slight, the Court must still find that "'[P]laintiff has set forth specific facts that support a finding of jurisdiction in order to deny the motion to dismiss.'" *Palnik v. Westlake Entm't, Inc.*, 344 F. App'x 249, 251 (6th Cir. 2009) (quoting *Kroger Co. v. Malease Foods Corp.*, 437 F.3d 506, 510 (6th Cir. 2006)). Thus, "it remains the plaintiff's burden and the complaint must have 'established with reasonable particularity' those specific facts that support jurisdiction." *Id.* (quoting *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002)). Consequently, the rules are designed in part to protect potential defendants from a "plaintiff's bald allegation of jurisdictional facts." *Serras v. First Tenn. Bank Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989).

"In diversity cases, federal courts apply the law of the forum state to determine whether personal jurisdiction exists." *Nationwide Mut. Ins. Co. v. Tryg Intern. Ins. Co., Ltd.*, 91 F.3d 790, 793 (6th Cir. 1996) (citations omitted). In order for personal jurisdiction to be proper, "both the

state['s] long-arm statute and constitutional due process requirements" must be met. *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000). As the United States Court of Appeals for the Sixth Circuit has noted, "Ohio's long-arm statute is not coterminous with federal constitutional limits." *Estate of Thompson*, 545 F.3d at 361 (citing *Calphalon Corp.*, 228 F.3d at 721). Thus, for the Court to have personal jurisdiction, it must find that the requirements of both Ohio's long-arm statute and constitutional due process are met. *Id.*

## B.    Dismissal under Rule 12(b)(6)

Fowlds Brothers, Showplace, and Dakotaland bring their motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, alleging that Plaintiff has failed to state a claim upon which relief can be granted.

Under the Federal Rules, any pleading that states a claim for relief must contain a "short and plain statement of the claim" showing that the pleader is entitled to such relief. Fed. R. Civ. P. 8(a)(2). To meet this standard, a party must allege sufficient facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). A claim will be considered "plausible on its face" when a plaintiff sets forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Rule 12(b)(6) allows parties to challenge the sufficiency of a complaint under the foregoing standards. In considering whether a complaint fails to state a claim upon which relief can be granted, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC*, 700 F.3d 829, 835 (6th Cir. 2012) (quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)). However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause

of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 663. Thus, while a court is to afford plaintiff every inference, the pleading must still contain facts sufficient to "provide a plausible basis for the claims in the complaint"; a recitation of facts intimating the "mere possibility of misconduct" will not suffice. *Flex Homes, Inc. v. Ritz-Craft Corp of Mich., Inc.*, 491 F. App'x 628, 632 (6th Cir. 2012); *Iqbal*, 556 U.S. at 679.

## III. DISCUSSION

The Court will discuss each claim sought to be dismissed in turn.

### A. Claims against Bruce and Jerald

#### 1. Veil piercing is not appropriate as to Bruce or Jerald.

Neither Bruce nor Jerald are alleged to have taken any relevant actions outside the capacity of owner or officer of the two corporations. Accordingly, to impose liability on either Bruce or Jerald, Parker must allege facts sufficient to pierce the corporate veils of Dakotaland or Fowlds Brothers. To determine whether a corporation's veil can be pierced, Ohio courts apply a three-pronged test:

> The corporate form may be disregarded and individual shareholders held liable for wrongs committed by the corporation when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud, [an illegal act, or a similarly unlawful act] against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

*Minno v. Pro-Fab, Inc.*, 121 Ohio St. 3d 464, 2009-Ohio-1247, 905 N.E.2d 613 (quoting *Belvedere Condominium Unit Owners' Ass'n v. R.E. Roark Cos., Inc.*, 67 Ohio St.3d 274, 617 N.E.2d 1075 (1993), at paragraph three of the syllabus, as modified by *Dombroski v. WellPoint, Inc.*, 119 Ohio St.3d 506, 2008-Ohio-4827, 895 N.E.2d 538).

Bruce and Jerald argue that, even assuming *arguendo* that Parker has sufficiently alleged that they exercise complete control over Dakotaland and Fowlds Brothers, she has not alleged that

their control was exercised in such a manner as to commit fraud or an illegal act. (Doc. 74, Mot. at 15–16). Parker responds that her Second Amended Complaint alleges that Dakotaland "owns no real estate" and regularly transfers approximately 85% of its revenue to Fowlds Brothers as truck lease payments (Doc. 45, 2d Am. Compl. at ¶ 76). In her opposition brief, she asserts that this allegation is sufficient to establish purposeful undercapitalization to shield assets from Parker, which would be a fraudulent use of the corporate form. (Doc. 82, Resp. at 26).

However, the transfer of assets between Dakotaland to Fowlds Brothers implicates the concept of horizontal veil piercing between corporations, not the vertical veil piercing that Parker seeks to accomplish between Dakotaland and Bruce and Jerald (and between Fowlds Brothers and Bruce and Jerald) to reach shareholder assets. And importantly, Parker does not allege that Dakotaland has insufficient remaining assets to compensate her. Thus, even if, *arguendo*, the second prong were met, Parker has not alleged that Bruce and Jerald's fraudulent exercise of control over the corporations harmed her in any way. There are therefore no grounds on which to pierce the corporate veils of Dakotaland or Fowlds Brothers to reach Bruce or Jerald's assets.

### 2. Parker alleges no independent grounds for personal jurisdiction over Bruce or Jerald.

As Bruce and Jerald are citizens of South Dakota, Parker must allege that they engaged in activity that would satisfy both Ohio's long-arm statute and due process constraints for the Court to exercise personal jurisdiction over them. While no party disputes this Court's personal jurisdiction over Dakotaland or Fowlds Brothers, "[i]t is settled that jurisdiction over the individual officers of a corporation cannot be predicated merely upon jurisdiction over the corporation." *Weller v. Cromwell Oil Co.*, 504 F.2d 927, 929 (6th Cir. 1974). And Parker has not alleged that Bruce or Jerald took any relevant actions outside their capacity as owners and officers of the corporations that would qualify under Ohio's long-arm statute.

In her opposition brief, Parker argues only that, in addition to the accident occurring in Ohio, "[t]he brothers are the equal owners of Defendant Dakotaland and Defendant Fowlds Brothers, businesses that regularly transact business in the state of Ohio, using Ohio infrastructure to deliver products and supplies to end-users across the eastern seaboard, including deliveries to people and companies in Ohio." (Doc. 82, Resp. at 27). Parker asserts that these activities satisfy the first three subsections of Ohio's long-arm statute, namely, "transacting any business in [Ohio]," "contracting to supply services or goods in [Ohio]," and "causing tortious injury by any act or omission in [Ohio]." Ohio Rev. Code § 2307.382(A).

But the Court has already determined *supra* that the corporate form should be respected as between each of Dakotaland and Fowlds Brothers on the one hand, and Bruce and Jerald on the other. As a result, Parker alleges no more than corporate activity, not activity by Bruce and Jerald individually. As Parker has not alleged facts that satisfy Ohio's long-arm statute as to Bruce and Jerald, the Court will dismiss all claims against them for lack of personal jurisdiction.

## B.      Claims against Fowlds Brothers

Although Parker alleges that Miller was functionally employed by "Dakotaland and/or Fowlds Brothers and/or Showplace," Parker does not dispute that Miller was at least nominally an employee of Dakotaland, the company that actually engages in the trucking business (as opposed to Fowlds Brothers, who, at least nominally, only owns the trucks and leases them to Dakotaland, and as opposed to Showplace, who, at least nominally, only uses Dakotaland as its independent contractor for its shipping needs).

The Second Amended Complaint reflects that Dakotaland (and not Fowlds Brothers) is registered as a "motor carrier" with the Department of Transportation, and Parker relies on violations of various regulations applicable only to "motor carriers" for her claim of negligent hiring and supervision in Count 5. (Doc. 45, 2d Am. Compl. ¶¶ 4, 169). Parker also alleges that

the vehicle Miller was driving was leased by Dakotaland from Fowlds Brothers at the time of the accident, and thus only Dakotaland could have negligently entrusted the truck to Miller as alleged in Count 6. As a result, all of Parker's claims against Fowlds Brothers hinge on Parker's theory that Dakotaland and Fowlds Brothers are really a single enterprise—in other words, that the two corporations are alter egos of each other and that the assets of one should be available to satisfy the liabilities against the other.

As recognized by the Court's previous order denying summary judgment for Fowlds Brothers (Doc. 38), Dakotaland and Fowlds Brothers are certainly related. Both have identical shareholders in identical proportions, and both share the same president and vice president. (Doc. 45, 2d Am. Compl. ¶¶ 6–8). Both have the same physical address. (*Id.* ¶ 28). In or around January 2016, the companies shifted some of Dakotaland's employees to Fowlds Brothers in order for both companies to qualify as small employers under the Affordable Care Act. (*Id.* ¶ 69). Those same employees were immediately loaned back to Dakotaland, though their payroll is processed through Fowlds Brothers. (*Id.* ¶ 70). The majority of Fowlds Brothers' truck leasing business comes from Dakotaland. (*Id.* ¶ 73). Parker aptly describes the two corporations as "engaging in symbiotic business enterprises that are financially dependent upon each other." (*Id.* ¶ 77).

However, the Ohio Supreme Court has definitively held that horizontal veil piercing is not available for sister corporations like Dakotaland and Fowlds Brothers, even where they share the same owners. *Minno v. Pra-Fab, Inc.,* 121 Ohio St. 3d 464, 905 N.E.2d 613 (2009). In *Minno,* an employee injured on the job sued his nominal employer (See-Ann) and its sister company (Pro-Fab), who the plaintiff argued were "fundamentally indistinguishable" from one another. *Id.* ¶ 5. Both See-Ann and Pro-Fab had "common individual shareholders and officers, are engaged in similar lines of work, and possess identical business addresses." *Id.* ¶ 14.

Despite these commonalities, the Ohio Supreme Court emphasized that "the corporations are separately incorporated and neither corporation has an ownership interest in the other." *Id.* Under these circumstances (as opposed to an individual shareholder alleged to be fundamentally indistinguishable from a corporation), "the common shareholder ownership of sister corporations does not provide one sister corporation with the inherent ability to exercise control over the other. Any wrongful act committed by one sister corporation might have been instigated by the corporation's owners, but it could not have been instigated by the corporation's sister." *Id.* ¶ 13. The *Minno* court therefore held that "a plaintiff cannot pierce the corporate veil of one corporation to reach its sister corporation. A corporation's veil may not be pierced in order to hold a second corporation liable for the corporate misdeeds of the first when the two corporations have common individual shareholders but neither corporation has any ownership interest in the other corporation." *Id.*

The relationship between Dakotaland and Fowlds Brothers is functionally indistinguishable from that of the sister corporations in *Minno*. Therefore, Parker may not pierce Dakotaland's corporate veil to reach Fowlds Brothers.

To avoid this result, Parker argues that she has not sought horizontal veil piercing at all, but has instead advanced a separate legal theory—that Dakotaland and Fowlds Brothers are a single enterprise. Parker contends that "Single Enterprise Theory is akin to the alter ego doctrine, wherein the economic fact pushes through the paper differentiations embodied in the corporate certificates and liabilities are dealt with in accord with the business, instead of the legal fact of corporate entity." (Doc. 82, Resp. at 12). She claims that such a theory has long been recognized by Ohio courts, but cites in support only a single case from 1907 and a single law review article from 1947, neither of which go further than recognizing that the corporate form may be disregarded

10

in the case of fraud.  *In re Rieger*, 157 Fed. 609, 1907 U.S. Dist. LEXIS 437, 1 A.F.T.R (P-H) 155,

8 Ohio L. Rep. 498 (S.D. Ohio 1907); *The Theory of Enterprise Entity,* p. 345, Adolf A. Berle, Jr.,

Columbia Law Review, April 1947.

Parker also attempts to distinguish "horizontal veil piercing" and "single enterprise theory"

by arguing that the former allows for vicarious liability of the affiliate, whereas the latter holds the

affiliate directly liable.  (Doc. 82, Resp. at 11).  But this distinction is not supported by citation,

nor is it a correct statement of the law.  The justification for veil piercing is that the shareholder

and the corporation are one and the same, such that the shareholder may fairly be held *directly*

liable for the corporation's liabilities.  *Belvedere*, 67 Ohio St. 3d at 288.  Thus, even as described

by Parker, her "single enterprise theory" is no more than an attempt at the horizontal veil piercing

foreclosed by the Ohio Supreme Court in *Minno*.

Finally, Parker argues that Fowlds Brothers is seeking a "third bite at the apple" on the

single enterprise theory, referencing the Court's earlier orders denying summary judgment for

Fowlds Brothers (Doc. 38) and denying reconsideration of that order (Doc. 57).  (Doc. 82, Resp.

at 24).  But in those earlier stages of the litigation, Parker had not yet fully articulated her single

enterprise theory and the Court was without the benefit of the parties' full briefing on the issue.  It

is clear at this stage that *Minno* is controlling and, accordingly, all claims against Fowlds Brothers

are dismissed.

**C.**     **Claims against Showplace**

Parker asserts several negligence-based claims against Showplace: statutory violations

establishing negligence *per se* in the hiring, training, supervising, and retaining Miller (Count 5),

vicarious liability for Dakotaland's negligence (Count 11), negligent retention of Dakotaland

(Count 12), and non-delegable duty to ensure Dakotaland operated in a non-negligent manner

(Count 13).  Showplace moves for dismissal of only Counts 5 and 13.

### 1. Count 5 (statutory violations establishing negligence *per se*)

Showplace argues Count 5 must be dismissed because the regulations it is alleged to have violated do not provide a private right of action. However, Parker has not asserted claims based solely on the violation of the regulations; she asserts only that Showplace's violation of the regulations establishes negligence *per se*. (Doc. 45, 2d Am. Compl. ¶ 173). The distinction is important:

> A plaintiff attempting to assert a private right of action under a statute is asserting that a violation of the particular statute, standing alone, entitles her to a remedy. *Fawcett v. G.C. Murphy & Co.,* 348 N.E.2d 144, 146 (Ohio 1976); *Cort v. Ash,* 422 U.S. 66, 77 (1975). Negligence *per se,* on the other hand, merely satisfies the duty and breach elements of a negligence claim. *Pond v. Leslein,* 647 N.E.2d 477, 479 (Ohio 1995); *Sikora* [*v. Wenzel*], 727 N.E.2d [1277,] 1281 [(Ohio 2000)]. The plaintiff still must meet her proofs on proximate cause and damages. *Pond,* 647 N.E.2d at 479.

*Thornton v. State Farm Mut. Auto Ins. Co.*, No. 1:06-CV-00018, 2006 WL 3359448, at *14 (N.D. Ohio Nov. 17, 2006). Parker has simply asserted a basic common law negligence claim whose first two elements, she contends, may be satisfied by Showplace's violation of various regulations. The availability of a private right of action under the regulations is therefore irrelevant.

The problem with Parker's Count 5 is that the standards she identifies largely cannot form the basis for negligence *per se*. Parker relies primarily on the Federal Motor Carrier Safety Regulations ("FMCSRs") at 49 C.F.R. §§ 350–99, as well as the motor carrier safety standards contained in Ohio Administrative Code §§ 4901:2-5-02 through 08. These are administrative rules and regulations adopted by the U.S. Department of Transportation and Ohio's Public Utilities Commission, respectively; they are not legislatively-enacted statutes. Again, the distinction is important: "[T]he violation of an administrative rule does not constitute negligence *per se*." *Chambers v. St. Mary's Sch.*, 82 Ohio St. 3d 563, 568, 1998-Ohio-184, 697 N.E.2d 198, 203.

In *Chambers*, the Ohio Supreme Court "distinguished between duties arising from statutes, which reflect public policy, and duties arising from administrative rules, which are created by administrative agency employees who act to implement the General Assembly's public-policy decisions." *Lang v. Holly Hill Motel, Inc.*, 122 Ohio St. 3d 120, 2009-Ohio-2495, 909 N.E.2d 120, ¶ 18 (citing *Chambers*, 82 Ohio St.3d at 564, 566–567). "If we were to rule that a violation of the [Building Code] (an administrative rule) was negligence *per se*, we would in effect bestow upon administrative agencies the ability to propose and adopt rules which alter the proof requirements between litigants. Altering proof requirements is a public policy determination more properly determined by the General Assembly . . . ." *Chambers*, 82 Ohio St. 3d at 568. Accordingly, Ohio does not recognize negligence *per se* based on the violation of an administrative regulation.

The one legislative enactment listed in Count 5 that might be relevant to negligence *per se* is Ohio Revised Code § 4511.79(B), which provides:

> No owner, as defined in section 4501.01 of the Revised Code, of a "commercial motor vehicle," "commercial car," or "commercial tractor," or a person employing or otherwise directing the driver of such vehicle, shall require or knowingly permit a driver in any such condition described in division (A) of this section to drive such vehicle upon any street or highway.

However, this statute does not apply to Showplace in the context of Parker's accident. The statute applies only to owners of commercial motor vehicles (defined in § 4501.01 has having title to the vehicle) or employers of drivers of such vehicles.

Parker's Second Amended Complaint alleges that Fowlds Brothers, not Showplace, is the owner of the vehicle Miller was driving. (Doc. 45, 2d Am. Compl. ¶ 11). And Parker has not sufficiently alleged that Showplace "employed or otherwise direct[ed]" Miller as the driver of the vehicle. Her general allegation that "Defendant Miller was the agent, servant, and/or employee of Defendant Dakotaland and/or Defendant Fowlds Brothers and/or Defendant Showplace" are not

plausible in light of the more specific allegations she makes as to the hiring and supervision of Miller. (*Id.* ¶ 16). To wit:

- Bruce Fowlds, Jon Otto and Dan Parker (all three of which Parker alleges to be officers or employees of Dakotaland and/or Fowlds Brothers, but not of Showplace) hire drivers for Dakotaland and/or Fowlds Brothers. Bruce Fowlds has the final decision-making power as to hiring, disciplining, and retaining drivers. (*Id.* ¶¶ 59, 61, 62, 65)

- Bruce Fowlds, Jon Otto, and Dan Parker comprise Dakotaland and/or Fowlds Brothers' "Review Board," whose purpose is to "address company safety concerns, including driver employment and retention decisions." (*Id.* ¶ 67).

- Miller submitted his employment application to Dakotaland and/or Fowlds Brothers. The application was reviewed by Bruce Fowlds, Jon Otto, and Dan Parker, and Dan Parker reached out Miller's past employers for references. "Defendant Bruce Fowlds, Jon Otto, and Dan Parker, through consensus on behalf of Defendant Dakotaland and/or Defendant Fowlds Brothers, hired Defendant Miller to operate a commercial motor vehicle in interstate commerce." (*Id.* ¶¶ 83–84, 92).

- After Miller was involved in multiple accidents while "operating a commercial motor vehicle for Defendant Dakotaland and/or Defendant Fowlds Brothers," "[t]he Review Board took no action against Defendant Miller." (*Id.* ¶¶ 101–102).

- Miller was eventually "placed on probation for his accidents by Safety Director, Dan Parker." (*Id.* ¶ 103).

According to Parker's own allegations, Miller was hired, supervised, and retained by Dakotaland and/or Fowlds Brothers without Showplace's involvement. Parker's further suggestion that "Showplace has *de facto* control over Defendant Dakotaland's daily operations as it provides seventy-five (75%) percent [*sic*] of the loads hauled by Defendant Dakotaland" does not hold water. (*Id.* ¶ 54). Although it may be true that "[i]f Defendant Showplace terminated, altered or otherwise reduced its relationship and/or reliance on Defendant Dakotaland to haul its products, then Defendant Dakotaland would suffer a financial hardship" (*id.*), this financial relationship is not sufficient to create *de facto* control over daily operations by one company over another. It certainly does not suffice to demonstrate that Showplace was Miller's employer or was otherwise directing Miller as required by § 4511.79(B).

In sum, Parker has not identified any statutory violations which could form the basis of negligence *per se* on the part of Showplace. To the extent that Parker hopes to establish that Showplace violated a non-statutory duty, that negligence claim would be redundant with Counts 11 and 12 (asserting vicarious liability for Dakotaland's negligence and direct liability for Showplace's retention of Dakotaland, respectively). Accordingly, Parker's claims against Showplace in Count 5 must be dismissed.

## 2. Count 13 (non-delegable duty)

Parker's Count 13 asserts that "Showplace is a commercial trucking company and a registered motor carrier with the U.S. department of Transportation (U.S. DOT #867220) which is subject to the Federal Motor Carrier Safety Regulations as an interstate trucking company and has a non-delegable duty to the public at large and may not use outside motor carriers to shield itself from liability." (Doc. 45, 2d Am. Compl. ¶ 205). She further states that "Showplace breached its non-delegable duty by selecting, hiring and/or retaining a Defendant Dakotaland and/or Defendant Fowlds Brothers when the independent contractor's driver, Defendant Miller negligently operated a commercial motor vehicle in an unsafe manner . . . ." (*Id.* ¶ 208).

Parker's appeal to the FMCSRs is unavailing as to Showplace. Although it may itself be a registered motor carrier, Showplace was not acting as a motor carrier in the context of Parker's injuries. Instead, as reflected by Parker's own allegations, it was acting as the manufacturer of wood products, which it then arranged to have transported by Dakotaland, a registered motor carrier. (*Id.* ¶¶ 23–27).

More importantly, to the extent Parker seeks to hold Showplace liable for the actions of Dakotaland and/or Fowlds Brothers, this claim is also redundant. The existence of any duty on the part of Showplace must be established as part of Parker's basic negligence claims in Counts 11 and 12. *Strother v. Hutchinson*, 67 Ohio St.2d 282, 285, 423 N.E.2d 467 (1981) (elements of

negligence are (1) the existence of a duty owed by the defendant to the plaintiff, (2) a breach of that duty, (3) causation, and (4) damages). The ability to delegate that duty (or lack thereof) might be raised in defense to Counts 11 and 12, but it does not by itself create a separate cause of action. The cases cited by Parker do not hold otherwise. Accordingly, Count 13 must be dismissed.

## D.     Punitive damages

All moving Defendants (Dakotaland, Fowlds Brothers, Bruce, Jerald, and Showplace) moved to dismiss Parker's requests for punitive damages. However, now that all claims against Fowlds Brothers, Bruce, and Jerald have been dismissed, the Court need only consider the viability of Parker's prayers for punitive damages against Dakotaland and Showplace.

Punitive damages may be awarded if a plaintiff establishes that "[t]he actions or omissions of that defendant demonstrate malice or aggravated or egregious fraud, or that defendant as principal or master knowingly authorized, participated in, or ratified actions or omissions of an agent or servant that so demonstrate." Ohio Rev. Code § 2315.21(C)(1). Parker and Defendants both identified the correct standard for actual malice:

> Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.

*Preston v. Murty*, 32 Ohio St. 3d 334, 334, 512 N.E.2d 1174, 1174 (1987). "[A]ctual malice can be inferred from conduct and surrounding circumstances which may be characterized as reckless, wanton, willful or gross." *Villella v. Waikem Motors, Inc.*, 45 Ohio St. 3d 36, 37, 543 N.E.2d 464, 467 (1989) holding modified by *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St. 3d 638, 635 N.E.2d 331 (1994). But the actions of a defendant must rise above mere negligence to be considered actual malice. "The focus is on the actor's conscious disregard of an almost certain risk of substantial harm. This distinguishes 'malicious' from 'non-malicious' conduct." *Kuebler v.*

*Gemini Transp.*, No. 3:12-CV-114, 2013 WL 6410608, at *5 (S.D. Ohio Dec. 9, 2013) (Rose, J.).

"The type of aggravated circumstances sufficient to support an award of punitive damages in a motor vehicle accident case may include intoxication and deliberate actions to flee the scene or evade responsibility." *MacNeill v. Wyatt*, 917 F. Supp. 2d 726, 730 (S.D. Ohio 2013) (Litkovitz, M.J.) (citing *Cabe v. Lunich*, 70 Ohio St. 3d 598, 640 N.E.2d 159, 163 (1994)).

No defendant has argued that Parker's allegations as to Miller are insufficient to support a claim for punitive damages against him. Parker's Second Amended Complaint alleges that Miller had full visibility of the patrol car's flashing lights with sufficient time and distance to change lanes or bring the truck to a stop, and yet he failed to apply his brakes until only a few seconds before the crash. (Doc. 45, 2d Am. Compl. ¶¶ 120–32). The Court previously denied Miller's motion for summary judgment on the request for punitive damages in Parker's First Amended Complaint (Doc. 38), and Miller has not re-moved to dismiss the request for punitive damages in Parker's Second Amended Complaint.

### 1. Punitive damages against Dakotaland

In an earlier stage of this case, the Court granted Dakotaland's motion to dismiss the request for punitive damages in Parker's First Amended Complaint. (Doc. 26). In that order, the Court concluded that Parker's First Amended Complaint did not sufficiently allege that Dakotaland "knowingly authorized, participated in, or ratified actions or omissions" of Miller as required by the second prong of R.C. § 2315(C)(1).

But in drafting her Second Amended Complaint, Parker had the benefit of significant discovery that was not available when drafting the earlier version. The Second Amended Complaint contains many more detailed factual assertions as to Dakotaland's alleged malice. While it remains true that Parker has not alleged that Dakotaland authorized, participated in, or ratified Miller's dangerous driving, Parker has now sufficiently alleged that Dakotaland's own

actions in hiring and retaining Miller demonstrate malice could satisfy the first prong of R.C. § 2315(C)(1).  Specifically, Parker now alleges:

- Dakotaland received an incomplete employment application from Miller which disclosed a previous crash on October 22, 2013 and an issue with Miller's commercial driver's license.  Despite concerns with the application, Dakotaland did not make further inquiries of Miller as to the previous crash or the license issue.  (Doc. 45, 2d Am. Compl. ¶¶ 81, 83, 86).  Nor did Dakotaland inquire with Miller as to inconsistencies between the application and various medical forms he submitted.  (*Id.* ¶ 91).

- Dakotaland sought references from Miller's previous employers, one of whom described Miller as "poor" in regard to compliance with safety regulations and logs and stated that he had been discharged for not having sufficient experience and being hard on equipment.  (*Id.* ¶ 84).

- Despite its concerns, Dakotaland hired Miller on February 2, 2015.  (*Id.* ¶ 92).

- Dakotaland did not make inquiries sufficient to discover that Miller had also been issued nine FMCSR violations while driving a commercial motor vehicle on August 26, 2014.  (*Id.* ¶ 85).  Dakotaland also failed to identify that Miller had less than 12 months of experience operating a commercial motor vehicle.  (*Id.* ¶ 94).  Having less than 12 months of experience meant Miller was an "entry-level driver" under 49 CFR 380.502.

- Miller was placed into service as a commercial motor vehicle driver for Dakotaland without entry-level driver training as required by 49 C.F.R. §§ 380.502–13.  (*Id.* ¶ 95).

- Within his first year of employment with Dakotaland, Miller was involved in five crashes.  Miller received no additional training or instruction after any of these crashes.  (*Id.* ¶ 101).

- Dakotaland's written policies provide that after the third driver incident in a year, the offending driver is to be terminated.  Yet Dakotaland continued to employ Miller, even after he was involved in five crashes within his first year.  (*Id.* ¶ 102).

- Dakotaland placed Miller on probation for his safety record during his annual review on February 2, 2016 (approximately two and a half months prior to the accident involving Parker).  (*Id.* ¶ 103).  During his probationary period, Miller received a written warning from Dakotaland for, *inter alia*, his repeated history of damaging the truck and trailer.  The letter also indicates that one of these incidents occurred in early March 2016.  (*Id.* ¶ 104).  Yet Dakotaland continued to employ Miller without further training or discipline.  (*Id.*).

- Less than a month after Miller received the written warning, he was involved in the accident that injured Parker.  (*Id.* ¶ 105).

These facts, if true, could support a finding of malice on the part of Dakotaland in hiring and retaining Miller.  Parker alleges that Dakotaland knew, or should have known, at the time it

hired Miller that he had a poor safety record, but nevertheless employed him to operate commercial motor vehicles, a potentially dangerous activity. Moreover, during Miller's employment, Dakotaland was faced with Miller's numerous crashes that should have resulted in termination pursuant to Dakotaland's own policies; yet Dakotaland continued to employ Miller without additional training or discipline. Thus, Parker has sufficiently alleged that Dakotaland, in hiring and continuing to employ Miller, exhibited a conscious disregard of an almost certain risk of substantial harm. Parker's request for punitive damages against Dakotaland therefore stands.

### 2. Punitive damages against Showplace

Just as with Dakotaland, Parker has not alleged any facts to support an inference that Showplace authorized, participated in, or ratified Miller's conduct. Nor has she alleged any facts that would support Showplace's knowledge, and conscious disregard, of the safety threat posed by Miller prior to the crash. She does allege, however, that Showplace knew or should have known that Dakotaland as a whole had an unsafe driving record, even outside of Miller's driving, and that it consciously disregarded that risk by continuing to retain Dakotaland as its exclusive motor carrier hauling outbound loads. Specifically, Parker alleges that:

- Since Dakotaland began transporting goods for Showplace in 2000, Showplace has received telephone calls, social media messages, and email complaints from the motoring public concerning unsafe driving by Dakotaland drivers. (Doc. 45, 2d Am. Compl. ¶ 33). Through these complaints or otherwise, Showplace has been on notice of incidents of dangerous driving by Dakotaland including incidents involving law enforcement, improper parking in the roadway, hard-braking causing cargo or pallets to skid 10–15 feet, cutting other vehicles off on the highway, almost causing crashes, tailgating, hit-skip, weaving through traffic, unsafe lane changes, passing on the right, speeding, and crashes. (*Id.* ¶ 34).

- Showplace was on notice of multiple crashes with other vehicles caused by or involving Dakotaland drivers, including three crashes in 2014. (*Id.* ¶ 35).

- At various times during the period between November 2010 through the time of Parker's injuries, Dakotaland was listed in publicly available profiles as being on alert status with the Federal Motor Carrier Safety Administration. Namely, Dakotaland was on alert status in the following categories:

- o Unsafe Driving (28 months)
- o Fatigued Driving (4 months)
- o Hours of Service Compliance (14 months)
- o Crash Indicator (21 months)
- o Controlled Substance/Alcohol (1 month) (*Id.* ¶ 36).

- Showplace has never inquired as to Dakotaland's safety record, data, or statistics available from the Department of Transportation. (*Id.* ¶ 40). Nor has Showplace discussed Dakotaland's safety record with Dakotaland. (*Id.* ¶ 42).

Showplace asserts that it cannot have known that Dakotaland posed a risk to the public because Dakotaland maintained a federal license as a motor carrier. (Doc. 86, Reply at 2–3). However, Showplace cites no authority for the proposition that a valid federal motor carrier license means that the motor carrier poses no risk to the public *per se*. And even if Showplace did not have actual knowledge of Dakotaland's spotty safety record, Ohio courts may impose punitive damages based on constructive knowledge. *E.g.*, *Davis v. Sun Ref. & Mktg. Co.*, 109 Ohio App. 3d 42, 58, 671 N.E.2d 1049, 1060 (Ohio Ct. App. 1996); *Stephens v. A-Able Rents Co.*, 101 Ohio App. 3d 20, 29, 654 N.E.2d 1315, 1320–21 (Ohio Ct. App. 1995). If, as Parker alleges, Dakotaland's safety statistics with the Department of Transportation were easily available to the public, her allegations could support constructive knowledge on the part of Showplace that Dakotaland may have posed an almost certain risk of substantial harm. As a result, Parker's request for punitive damages against Showplace stands.

## IV. CONCLUSION

For the foregoing reasons, the Motions to Dismiss are **GRANTED IN PART and DENIED IN PART**. All claims against Fowlds Brothers Trucking, Inc., Bruce Fowlds, and Jerald

Fowlds are **DISMISSED**.  Further, Count 5 is **DISMISSED** as to Showplace only and Count 13

is **DISMISSED** in its entirety.  All other claims remain pending.

The Clerk shall remove Documents 72 and 73 from the Court's pending motions list.

**IT IS SO ORDERED.**

_/s/ George C. Smith_
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**